UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IAN LOCKHART (R-18787), | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-4193 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CHARLES F. BEST, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The Illinois Department of Corrections transferred an inmate, Ian Lockhart, to the Stateville Correctional Center. The Stateville Investigations and Intelligence Unit suspected that Lockhart held a leadership role in a gang, the notorious Gangster Disciples. Correctional officers tried to get Lockhart on board as an informant. He refused.

Lockhart awoke one morning to two pieces of unwelcome news. He learned that he was getting a disciplinary ticket about his gang activity. And he learned that he was getting transferred to another IDOC facility. A hearing before a disciplinary committee followed within the hour.

The disciplinary committee read into the record the charging document, which relied on confidential sources. Lockhart gave a statement, but no other witnesses testified.

The hearing didn't take long, and things did not go Lockhart's way. The committee found Lockhart guilty of (1) conspiring to assault an inmate, and (2) engaging in gang activity. As punishment, Lockhart received time in segregation.

Lockhart later sued, bringing three claims. He brought a First Amendment claim against two correctional officers, alleging that they retaliated against him when he refused to become an

informant and when he filed a grievance. He also brought a due process claim against the members of the disciplinary committee, based on a number of alleged procedural errors at the hearing. He brought an indemnification claim, too.

After discovery, Defendants moved for summary judgment. This Court later issued a split decision. This Court granted Defendants' motion on the First Amendment claim, and on the indemnification claim. But on the due process claim, the ruling was more complicated.

Defendants moved for summary judgment on the second prong – and *only* the second prong – of a due process claim, meaning whether the procedures were constitutionally deficient. This Court ruled that the due process claim could survive, but only in part. The due process claim about the assault charge (meaning charge #1) failed, but the due process claim about the gang charge (meaning charge #2) could go forward.

Along the way, this Court noted that Defendants did not move for summary judgment on the first prong of the due process claim, meaning whether the state had interfered with a liberty or property interest.

Defendants later took that observation as an invitation, or at least an opening. Defendants filed a motion for leave to file a second motion for summary judgment. This Court reluctantly granted that motion and gave both sides a chance to file a follow-up motion for summary judgment. Defendants later filed another motion for summary judgment, but Lockhart did not.

Defendants' second motion for summary judgment is now before the Court. For the reasons that follow, Defendants' motion for summary judgment is hereby granted.

2

## Background

This Court assumes familiarity with the background of the case from its ruling on Defendants' first motion for summary judgment. *See* 2/24/22 Order (Dckt. No. 113). So, a short summary will do here.

Ian Lockhart arrived at the Stateville Correctional Center in July 2016, after a transfer from another IDOC facility. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 7 (Dckt. No. 149). Lockhart's experience at Stateville was rocky from the start.

Shortly after his arrival, correctional officers came to believe that Lockhart was a leader in the Gangster Disciples, a designated Security Threat Group. *See* 2/24/22 Order, at 7–8 (Dckt. No. 113).

Scrutiny grew in October 2016, and officers began investigating Lockhart. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 149).

Early on the morning of November 1, 2016, an officer told Lockhart that the IDOC was transferring him from Stateville to Pontiac Correctional Center. *Id.* at ¶ 8. Around 8:00 a.m., Officer Sean Furlow issued Lockart an offender disciplinary report, otherwise known as a disciplinary ticket. *Id.* The report noted two offenses: a gang-related offense and an assault-related offense. *Id.* at ¶ 10 ("205 STG [Security Group Threat] or Unauthorized Organizational Activity," and "601 to 102 Conspiracy to Assault any Person.").

According to the disciplinary ticket, the investigation uncovered that Lockhart – as a leader of the Gangster Disciples – had authorized an assault on a fellow gang member at Stateville. *Id.* at ¶ 11. The assault took place a few weeks earlier, on October 18, 2016.

3

The disciplinary ticket required a hearing, but Lockhart was leaving Stateville. The imminent departure created a potential timing issue. Inmates are entitled to 24-hour notice before a disciplinary hearing. But the right to notice is waivable.

So, Officer Furlow gave Lockart two options: waive the 24-hour notice of charges before the hearing, or have the hearing after his transfer to Pontiac. *Id.* at ¶ 12. Lockhart opted to waive the 24-hour notice. *Id.* at ¶ 13. Basically, Lockhart decided to have the hearing then and there.

The hearing happened fast, and it didn't take long. It began at 8:45 a.m. – less than an hour after Lockhart had learned of the charges. *Id.* at ¶ 14. The hearing was before the Adjustment Committee, comprised of Defendants Charles Best and Barea Miggins. *Id.* at ¶ 15.

The Adjustment Committee later produced a Final Summary Report summing up what happened at the hearing. *Id.* The report identified the offenses charged in the ticket: gang activity and conspiring to assault another inmate. *Id.* at ¶ 16. The report also confirmed that Lockhart had waived the 24-hour notice requirement after receiving the ticket. *Id.* at ¶ 17.

According to the report, the disciplinary ticket was read at the hearing. *Id.* at ¶ 19. Lockhart pled not guilty and offered a statement in support of his plea. *Id.* Lockhart did not call any witnesses. *Id.* at ¶ 18.

The Adjustment Committee found Lockhart guilty of both charges. *See* Final Summary Report, at 1 (Dckt. No. 94-4). The Committee based its decision on the findings from the investigation. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 7 (Dckt. No. 149). The investigation revealed that Lockhart held a leadership rank in the Gangster Disciples and had authorized the assault on a fellow gang member. *Id.*

The Adjustment Committee recommended disciplinary action, including one year of "C-grade" (*i.e.*, restricted privileges), one year of segregation, one year of commissary

4

restrictions, and six months of contact visit restrictions. *Id.* at ¶ 21; *see also* Final Summary Report, at 1 (Dckt. No. 94-4). The Chief Administrative Officer later approved those restrictions. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 22 (Dckt. No. 149).

Lockhart did not lose good time credits because of the Adjustment Committee's findings. *Id.* at ¶ 23. So he won't spend more time in custody. Lockhart was served with a copy of the final summary report on November 7, 2016. *Id.* at ¶ 26.

When Lockhart arrived at Pontiac in November 2016, he went to disciplinary segregation. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 2 (Dckt. No. 155). But the parties disagree about how long Lockhart spent in disciplinary segregation. *Id.* at ¶ 5.

Lockhart contends that he spent a year in disciplinary segregation. *Id.* He testified: "I completed the year of segregation and was immediately put into administrative detention, in which the first three months of administrative detention was identical to dispatch segregation." *See* Lockhart Dep., at 66:23 – 67:2 (Dckt. No. 94-2).

Defendants contend that Lockhart spent only a fraction of that amount in disciplinary segregation. As they see it, Lockhart spent a little less than eight months in disciplinary segregation, not one year.

IDOC records show that Lockhart was placed in segregation on November 2, 2016. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 2 (Dckt. No. 155); *see also* Cumulative Counseling Summary (Dckt. No. 150-2, at 5–6 of 6). But Lockhart was placed in administrative housing – not segregation – from November 11, 2016 to March 28, 2017. *Id.*

Specifically, on November 2, 2016, the report lists his "Location" as "NORTH SEGREGATION/PON." *See* Cumulative Counseling Summary (Dckt. No. 150-2, at 6 of 6). But according to the report, Lockhart resided in "NORTH ADMINISTRATIVE/PON" on

5

November 11, 2016. *Id.* The report shows that Lockhart remained in administrative housing until March 28, 2017. At that point, the report shows that he resided in "NORTH SEGREGATION/PON." *Id.* at 4–6.

The report shows that Lockhart remained in segregation until November 15, 2017. *Id.* at 2. On November 17, 2017, the report shows his "Location" as "NORTH ADMINISTRATIVE/PON." *Id.*

So, based on IDOC records, Lockhart did not spend a year in disciplinary segregation. He was in segregation starting on November 2, 2016. He was in administrative housing – not segregation – from November 11, 2016 to March 28, 2017. He returned to segregation on March 28, 2017, and stayed in segregation until November 15, 2017.

In sum, IDOC records show that Lockhart was in disciplinary segregation from November 2 to November 11, 2016 (*i.e.*, nine days), and from March 28, 2017 to November 15, 2017 (*i.e.*, 232 days). That's a little less than eight months.

Pontiac's North Cell House only includes restrictive housing. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 155); *see also* Pontiac CC Offender Orientation Manual, at 5 (Dckt. No. 150-3). But North Cell House includes inmates designated for both disciplinary segregation and administrative detention. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 3.

Administrative detention is considered non-punitive. *See* Lockhart Dep., at 32:11-20 (Dckt. No. 94-2). Lockhart testified: "Segregation is for disciplinary segregation. When you get disciplined, they isolate you from the general population, and you do your segregation / solitary confinement time as punishment. Administrative detention is a status where they

6

separate you from the general population and isolate you into another population for nonpunitive reasons, I guess." *Id.* at 32:12-19.

Lockhart filed this lawsuit on a *pro se* basis on June 15, 2018. *See* Cplt. (Dckt. No. 1). He then amended his complaint twice. *See* First Am. Cplt. (Dckt. No. 17); Second Am. Cplt. (Dckt. No. 76). Along the way, the case was reassigned to this Court. This Court later appointed counsel for Lockhart.[1]

The second amended complaint includes three counts. Count I is a First Amendment claim about retaliation. Count II is a due process claim about the disciplinary proceeding. Count III is an indemnification claim.

After discovery, Defendants moved for summary judgment. This Court granted the motion on the First Amendment claim, which had a few different theories. This Court concluded that Defendants were entitled to qualified immunity on the theory about refusing to serve as an informant. *See* 2/24/22 Order, at 14–17 (Dckt. No. 113); *Clark v. Reed*, 772 F. App'x 353 (7th Cir. 2019). The other theory was about the emergency grievance, and the Court concluded that the evidence did not support it. *See* 2/24/22 Order, at 17–23.

Defendants also moved for summary judgment on the due process claim. A due process claim has two elements: a protected liberty interest or property interest, and inadequate procedures. *See Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).

Defendants moved for summary judgment based on the second element, only. That is, they argued that the procedures were constitutionally adequate, so there was no due process problem.

---

[1] The Court thanks Plaintiff's counsel for the capable *pro bono* service.

This Court granted that motion in part. Lockhart advanced seven different reasons why, in his view, the procedures were inadequate. Most of the arguments didn't pass muster.

For present purposes, the most important argument involved the sufficiency of the evidence. Lockhart basically argued that the committee violated his due process rights because the committee lacked evidence to support its decision.

This Court held that Lockhart's claim about the sufficiency of the evidence on the *assault* charge (meaning charge #1) could not go forward. But this Court held that Lockhart's claim about the *gang* charge (meaning charge #2) passed muster.

The reason involved the reliance on confidential sources. The assault charge relied on two confidential sources, so there was an adequate evidentiary basis for the committee's decision. But the gang charge relied on only one confidential source, so there wasn't an adequate evidentiary basis. *See McCollum v. Williford*, 793 F.2d 903, 907 n.3 (7th Cir. 1986) (holding that a finding of guilt supported by more than one reliable confidential source would satisfy due process, while relying on only one source requires independent factual corroboration).

Along the way, this Court drew attention to the fact that Defendants did not move for summary judgment based on the first element of a due process claim, meaning the existence of a protected liberty or property interest. *Id.* at 23 n.9. The Court flagged the open issue because not every liberty restriction in prison can give rise to a claim. "By its very nature, prison involves liberty restrictions. Not every restriction or punishment in a custodial setting implicates the Due Process Clause." *Id.*

Before ending its ruling, this Court granted summary judgment to Defendants on the indemnification claim, too. *Id.* at 31–32.

After that ruling, the only remaining claim is the due process claim about the assault charge. Lockhart claims that the Adjustment Committee violated his right to due process because the committee lacked sufficient evidence that Lockhart had conspired to assault another inmate. *Id.* at 32.

But Defendants saw a potential opening, and tried to put their foot in the door. Defendants moved for leave to file a second motion for summary judgment. *See* 2/8/23 Mtn. (Dckt. No. 140). They asked for permission to file a summary judgment motion about the existence of a liberty interest, meaning the first element of the due process claim.

This Court granted the motion for leave to file a second motion for summary judgment, "albeit with considerable hesitation." *See* 3/7/23 Order (Dckt. No. 142). It's not hard to imagine the reason for hesitation.

District courts have more than enough motions on their plates without allowing parties to try and try again to avoid trial. Allowing multiple rounds of summary judgment motions would water down the incentive for parties to make their best arguments. Parties might not give summary judgment motions their best shot if they know that they'll have another shot. There is something to be said for putting your best foot forward, without assuming that the other foot will get a step, too.

There is a real-world cost for multiple rounds of motions, and that cost is borne by all other litigants. A district court's time is zero sum. Every motion requires a ruling, and any time spent on a ruling is time that a district court cannot spend on another motion in another case. In effect, innocent bystanders in other cases on the Court's docket bear the cost. It's the litigation equivalent of budging back in line, after you've already had a turn.

Even so, it seemed inevitable that this Court would need to decide the issue someday, one way or the other. The issue might rear its head in a motion for a directed verdict, for example.

And critically, Lockhart filed a motion for summary judgment on March 9, 2022, a few weeks after this Court issued its summary judgment decision on February 24, 2022. *See* Pl.'s Mtn. (Dckt. No. 113). This Court struck that filing as untimely, given that it arrived a year after the deadline for dispositive motions. *See* 3/21/22 Order (Dckt. No. 119); *see also* 2/23/21 Order (Dckt. No. 90).

Putting it together, both sides expressed an interest in moving for summary judgment, after this Court issued its decision. Defendants asked for leave to move for summary judgment on the limited issue of the existence of a liberty or property interest, meaning the first element of a due process claim. And Plaintiff had moved for summary judgment about a year too late.

In the end, this Court took an even-handed approach, and gave each side another opportunity to move for summary judgment. *See* 3/7/23 Order (Dckt. No. 142); *see also* 4/27/22 Order (Dckt. No. 125). But the window of opportunity was not unlimited. "This Court is not revisiting its prior ruling, so the parties must not attempt to rehash those issues." *Id.*

Defendants took advantage of that opportunity and filed a second motion for summary judgment. *See* Defs.' Second Mtn. for Summ. J. (Dckt. No. 145). They argue that Lockhart cannot demonstrate a deprivation of a protectible liberty or property interest. *Id.* at 2. Lockhart, however, did not file another motion for summary judgment.

As a result, the only pending motion is Defendants' second motion for summary judgment.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

Lockhart's remaining claim is about the disciplinary hearing itself. Lockhart alleges that Defendants Best and Miggins deprived him of his right to due process under the Fourteenth Amendment during his disciplinary hearing. *See* Second Am. Cplt., at ¶¶ 54–57 (Dckt. No. 76).

A due process claim requires an inmate to prove that "(1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient." *See Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Due process protects the public from the arbitrary, abusive exercise of government power. Basically, the state cannot take away something of value, without notice and an opportunity to be heard.

The first motion for summary judgment was about the second element. And the second motion for summary judgment (meaning the motion at hand) is about the first element. Defendants argue that Lockhart cannot show that he had a constitutionally protected liberty interest at stake. *See* Defs.' Mem. in Support of Second Mtn. for Summ. J., at 2 (Dckt. No. 147).

Prison itself is a restriction on liberty, by design. That's the whole point. So, it goes without saying that not every restriction or punishment in a custodial setting implicates the Due Process Clause. *See Lisle v. Welborn*, 933 F.3d 705, 720–21 (7th Cir. 2019); *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In prison, the loss of liberty comes with the territory.

Generally, prisoners have no constitutionally protected liberty interest in remaining within the prison's general population and staying out of segregation. *See Sandin*, 515 U.S. at 486. But avoiding segregation can constitute a protected liberty interest "when the confinement imposes 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Lisle*, 933 F.3d at 721 (quoting *Sandin*, 515 U.S. at 484); *see also Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (concluding that "harsh" segregation conditions in prison "g[a]ve rise to a liberty interest in their avoidance").

So, the question is whether disciplinary segregation imposes atypical and significant hardship. To answer that question, a court must "analyz[e] the combined import of the duration

12

of the segregative confinement *and* the conditions endured by the prisoner during that period." *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697 (7th Cir. 2009) (emphasis in original); *see also Lisle*, 933 F.3d at 721.

In other words, the hardship depends on the length and severity of disciplinary segregation. Courts must consider how long segregation lasted, and how bad the segregation was.

Applying that framework, this Court will consider the length of Lockhart's confinement, and then will consider the conditions of his segregation.

**I. Duration of Confinement**

The Court starts by considering the duration of Lockhart's disciplinary segregation. The parties offer conflicting evidence on the length of segregation, so there is a genuine issue of fact. But whether that question of fact is material is another story.

The Seventh Circuit has declined to set a floor on how long a prisoner must serve before he can complain about a deprivation of due process. *See Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015). The existence of a hardship depends on the length of the condition, and the severity of the condition. It's a sliding scale: the longer the term of confinement, the more scrutiny the condition of confinement will receive. *See Marion*, 559 F.3d at 698.

The Seventh Circuit has sent some conflicting signals about the length of time that it takes to give rise to a claim. At one point, the Seventh Circuit held that "six months of segregation is 'not such an extreme term' and, standing alone, would not trigger due process rights." *Id.* (quoting *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir. 1995)).

But a later decision by Judge Posner made clear that segregation of less than six months is not a get-out-of-a-lawsuit-about-a-jail free card. "Six months is not an apt presumptive

13

minimum for establishing a violation." *See Kervin*, 787 F.3d at 837. The Court of Appeals seemed to walk back the notion that a six-month "period of inhuman confinement is a condition precedent to a deprivation of a prisoner's constitutionally protected liberty." *Id.* at 836. A "considerably shorter period of segregation," meaning a period of less than six months, "may, depending on the conditions of confinement and on any additional punishments, establish a violation." *Id.*

Six months may not be a safe harbor, but it looks like one year is an unsafe harbor. "[O]ne year of time in disciplinary segregation [] is the kind of discipline that may trigger Fourteenth Amendment due process requirements." *Duffin v. Anderson*, 2017 WL 6028532, at \*6 (S.D. Ill. 2017).

So, six months might be enough to trigger a due process claim. Or maybe not. With that flexible standard in mind, the Court turns to the facts at hand. And the facts are in flux, too.

Lockhart testified that he spent a year in segregation. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 155); *see also* Lockhart Dep., at 66:23 – 67:2 (Dckt. No. 94-2). But Defendants contend that the real number was closer to eight months (a little less, actually). According to IDOC records, Lockhart was in disciplinary segregation from November 2 to November 11, 2016 (*i.e.*, nine days), and from March 28, 2017 to November 15, 2017 (*i.e.*, 232 days). *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 2 (Dckt. No. 155); *see also* Cumulative Counseling Summary (Dckt. No. 150-2, at 2–6 of 6).

So, at a bare minimum, the parties agree that Lockhart spent at least seven and a half months in disciplinary segregation. Lockhart presented evidence that the time was longer. Defendants do not argue that the time was shorter. Disciplinary segregation lasted nearly eight months, and maybe more.

14

Plus, Lockhart is the non-movant, and he presented admissible evidence (*i.e.*, his testimony) that disciplinary segregation lasted one year. So, for purposes of the motion for summary judgment, the Court views the record in his favor, and concludes that a reasonable jury could find that his disciplinary segregation lasted one year.

That's enough time to potentially give rise to a due process claim. It depends on the conditions of confinement. That's the next issue.

## II.     Conditions of Confinement

Lockhart testified that he spent a year in disciplinary segregation. Whether he suffered a hardship – that is, an invasion of a protectible liberty interest – depends on the severity of his confinement.

A court must look at the aggregate punishments inflicted, not separately evaluate the gravity of each punishment meted out. *See Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015); *see also Marion*, 559 F.3d at 699.

"[T]he critical question is how far the treatment of the complaining inmate deviates from [the] ordinary conditions." *Kervin*, 787 F.3d, at 836. "[I]f the disciplinary measures do not 'substantially worsen the conditions of confinement' of an inmate, then he has not been deprived of a protected liberty interest." *Lisle*, 933 F.3d at 721 (quoting *Miller v. Dobier*, 634 F.3d 414, 414–15 (7th Cir. 2011)).

To survive summary judgment, a plaintiff must offer evidence "that would allow a jury to determine that the conditions in segregation deviated substantially from ordinary conditions of his confinement." *Id.* That raises a question: what's the benchmark for "ordinary conditions"?

The standard is not, as you might assume, the situation of an inmate who is not in segregation. Instead, the point of comparison is non-disciplinary segregation. "[U]nder *Sandin*

15

the key comparison is between disciplinary segregation and nondisciplinary segregation rather than between disciplinary segregation and the general prison population." *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997).

Discretionary segregation – unlike disciplinary segregation – is not "atypical" within the prison context. *See Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008). "This is because, in every state's prison system, any member of the general prison population is subject, without remedy, to assignment to administrative segregation or protective custody at the sole discretion of prison officials . . . ." *Lekas v. Briley*, 405 F.3d 602, 609 (7th Cir. 2005). So, "discretionary segregation is . . . an ordinary incident of prison life that inmates should expect to experience during their time in prison." *Townsend*, 522 F.3d at 771 (internal quotation marks omitted); *see also Smith v. Akpore*, 689 F. App'x 458, 459 (7th Cir. 2017) (holding that plaintiff did not suffer a deprivation of due process because he failed to show that he had a protected liberty interest in remaining in the general population).

According to Defendants, the record includes no evidence whatsoever about the conditions of Lockhart's confinement in segregation at Pontiac. *See* Defs.' Mem. in Support of Second Mtn. for Summ. J., at 6 (Dckt. No. 147); Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 33–34 (Dckt. No. 149).

For his part, Lockhart claims that he provided testimony at deposition about the conditions of his confinement. *See* Pl.'s Resp. to Second Mtn. for Summ. J., at 8 (Dckt. No. 151); Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 34 (Dckt. No. 149). But Lockhart points to no evidence in the record about the conditions of confinement, except his deposition.[2]

---

[2] In his brief opposing summary judgment, Lockhart also points to the operative complaint's descriptions of the differences between disciplinary segregation and general population. *See* Pl.'s Resp. to Second Mtn. for Summ. J., at 10 (Dckt. No. 151) (citing Second Am. Cplt., at ¶¶ 43–46 (Dckt. No. 76). However, "mere allegations of a complaint" are not "admissible evidence as required at the summary judgment

16

The Court agrees that the record does, in fact, contain evidence about the conditions of confinement in disciplinary segregation. Lockhart testified about it. But his testimony established that the conditions of disciplinary segregation were not "substantially" worse than the conditions in "nondisciplinary segregation." *Lisle*, 933 F.3d at 721; *Wagner*, 128 F.3d at 1175. Quite the opposite – they were basically the same.

At deposition, Lockhart described the conditions in disciplinary segregation. "In segregation here in Pontiac, the whole entire time I was in north house. North house is single-man cell status, single yard status, single shower area, single everything. You have no human contact." *See* Lockhart Dep., at 33:5-10 (Dckt. No. 94-2).

Lockhart testified that he was isolated from the general prison population as a punishment. *Id.* at 32:12-16 ("When you get disciplined, they isolate you from the general population, and you do your segregation / solitary confinement time as punishment.").

But Lockhart testified that prisoners could be placed in administrative detention for non-punitive reasons – and that prisoners in administrative detention were isolated from the general population, too. *Id.* at 32:16-19. In fact, Lockhart testified that the first three months of administrative detention were "identical" to segregation. *Id.* at 33:14. Either way, there was no interaction with other inmates:

> Q: And forgive me, but are there times in segregation you're celled with another inmate?
>
> A: Not in Pontiac. In Pontiac I was isolated from – I had no contact here in Pontiac.
>
> Q: At all times or only when you're in administrative detention?
>
> A: In segregation.

---

stage." *See Tibbs v. City of Chicago*, 469 F.3d 661, 663 n.2 (7th Cir. 2006). So, the Court will not consider the allegations from the complaint in ruling on the motion at hand.

17

> Q: In segregation.
>
> A: In segregation here in Pontiac, the whole entire time I was in north house. North house is single-man cell status, single yard status, single shower area, single everything. You have no human contact. So the whole time I've been here in Pontiac I've been in north house. No human contact.
>
> Even when you get out of segregation you go to administrative detention. For the first three months of administrative detention, *it's identical to segregation*. It's the same segregated yards, same set outfits, same seg.

*Id.* at 32:21 – 33:15 (emphasis added).

Later, Lockhart confirmed that disciplinary segregation is "identical" to administrative detention:

> Q: Okay. Have you served that sentence so to speak?
>
> A: Yes. I completed the year of segregation and was immediately put into administrative detention, in which the first three months of administrative detention was *identical to dispatch segregation*.

*Id.* at 66:23 – 67:2 (emphasis added).

Lockhart offered evidence that prisoners in segregation are not allowed human contact, unlike prisoners in general population. *Id.* at 32:12 – 33:10. But again, the point of comparison is not the prisoners in general population, but rather the prisoners in administrative detention. And prisoners in administrative detention lack contact with other prisoners, too. *Id.* at 32:16-19. "Administrative detention is a status where they separate you from the general population and isolate you into another population for non-punitive reasons, I guess." *Id.*

Lockhart admitted that the conditions of disciplinary segregation are no different than the conditions in administrative detention. And on the flipside, Lockhart has not come forward with evidence that the conditions in disciplinary segregation were meaningfully worse.

18

Based on the record, the conditions of Lockhart's disciplinary segregation were not worse than the conditions in administrative detention. *See Wagner*, 128 F.3d at 1175. So, a reasonable jury could not conclude that the conditions of Lockhart's disciplinary segregation "deviated substantially" from the norm. *See Lisle*, 933 F.3d at 721; *see also id.* (agreeing with district court that evidence of rusted cell bars and corroded feces in toilet was not enough to show plaintiff suffered significant hardship); *Hardaway v. Meyerhoff*, 734 F.3d 740, 744 (7th Cir. 2013) (concluding that prisoner was not deprived of due process interest where he had limited human contact and could shower and use the yard once a week).

To be sure, Lockhart received multiple punishments, not simply time in disciplinary segregation. He also received one year of "C-grade" (*i.e.*, restricted privileges), one year of commissary restrictions, and six months of contact visit restrictions. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 21 (Dckt. No. 149). That's not nothing. After all, the whole point was to punish him.

Even so, Lockhart does not argue that this combination of punishments deprived him of a protected liberty interest. *See Judkins v. Pierce*, 2023 WL 6141608, at *2 (7th Cir. 2023), *reh'g denied,* 2023 WL 7411555 (7th Cir. 2023); *see also Kervin*, 787 F.3d at 836. And the Seventh Circuit has concluded that prisoners suffered no loss of liberty when they received similar deprivations. *See, e.g.*, *Judkins*, 2023 WL 6141608, at *2 (six months in segregation and six months' loss or restriction of privileges, without more, did not implicate protected liberty interest).

In sum, based on the evidence in the record, no reasonable jury could find that disciplinary segregation and the other forms of punishment "substantially worse[ned]" Lockhart's confinement. *See Lisle*, 933 F.3d at 721. Lockhart has not come forward with

19

sufficient evidence that he suffered a loss of a protectible liberty interest. So he has no due process claim.

## Conclusion

For the foregoing reasons, Defendants' second motion for summary judgment is granted.

Date: January 18, 2024

Steven C. Seeger
United States District Judge